IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | **CASE NO. 8:12CR24** |
| vs. | |
| NATHAN YOUNG, | **MEMORANDUM AND ORDER** |
| Defendant. | |

This matter is before the Court on the Findings and Recommendation (Filing No. 39) issued by Magistrate Judge Thomas D. Thalken recommending that the motions to suppress statements (Filing No. 26) and evidence seized during the execution of a search warrant (Filing No. 28) filed by the Defendant, Nathan Young, be denied. Young filed a statement of objections to the Findings and Recommendation and a supporting brief (Filing Nos. 40, 41) as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a).

Young is charged in a two-count Indictment with sexually exploiting a child (Count I) and receiving child pornography (Count II). He seeks suppression of statements given to law enforcement on September 21, 2011, and evidence seized during the execution of a search warrant on September 22, 2011.

Following an evidentiary hearing, Judge Thalken issued a written Findings and Recommendation, in which he concluded: Young was not in custody when he made the statements to law enforcement; he made those statements voluntarily; because Young's statements were not illegally obtained, the evidence seized under the search warrant was not the "fruit of the poisonous tree"; apart from the liquid male enhancement and photographs, the items seized fell within the categories listed in the search warrant; and

1

the penile enhancement liquid and photographs were immediately apparent to officers as incriminating evidence and were in plain view. Judge Thalken therefore recommended that the motions to suppress be denied.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(C), the Court must make a de novo determination of those portions of the Findings and Recommendation to which the Defendant has objected. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings or recommendation. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## STATEMENT OF FACTS

Judge Thalken provided a very detailed account of the events surrounding Young's questioning and the execution of the search warrant. Summarizing Judge Thalken's initial findings, officers learned that Young, a registered sex offender, was a Facebook friend of, and associated with, approximately sixty-five middle-school-aged girls. Officers interviewed some of them at the middle school and learned that Young communicated with the girls on Facebook, in person, and via chat rooms, cell phones, and Xbox LIVE. After the interviews,

> There was an early dismissal at the Columbus Middle School and rather than going back to the station at CPD, Investigators Mueller and Lozos drove together in an unmarked CPD car to Young's residence in a trailer park (TR. 20). Investigator Mueller was concerned some of the students they interviewed may contact Young and let him know the police were asking questions about him (TR. 22). The drive took about five minutes and upon arrival, Investigator Mueller knocked on the door (TR. 21). Young's mother came to the door and Investigator Mueller asked to speak with Young (TR. 21). Young came to the door dressed in jeans with no shirt or shoes, shut the door behind him, and spoke with Investigator Mueller on the porch (TR. 21). Investigator Mueller identified herself and asked Young if he would come down to the station and answer some

2

questions (TR. 22). Investigator Mueller testified she wanted to talk with Young at the station because she believed the trailer home to be quite cluttered and untidy, which she recalled from a past visit, there were several dogs present, and Young's mother would be present (TR. 22). Young asked to get some shoes and a shirt, went back inside, and closed the door (TR. 23). Young reemerged dressed in jeans, a shirt, and shoes (TR. 23). Although there were two cars outside the residence, Young said they were inoperable (TR. 23). Young asked if Investigator Mueller drove him to the police station, could Young be given a ride back home (TR. 23). Investigator Mueller agreed to do so (TR. 23). The drive to the station was about two miles and took about five minutes (TR. 25). There was no conversation during the drive about the case but there was some conversation about the weather (TR. 25). Upon arrival at the station, Investigator Mueller parked at the rear of the station and entered through the back door using a key pad (TR. 26). The back door of the station opens to a booking area and holding cells with an inner door to the main part of the police department, which was propped open and otherwise accessible by a key pad (TR. 26). Investigator Mueller and Young walked through the main police department to an interview room (TR. 26). The interview room door was not locked and Young could have left the room and the main police department without assistance if he chose (TR. 27-28). The interview room was approximately five feet by eight feet and was equipped with a camera and sound recording (TR. 29; 67; Exhibit 1₁). A small table was in one corner with two chairs (Exhibit 1).

Once inside the interview room, Investigator Mueller pulled down the blinds in the room to a window to the public area of the main police station (TR. 67; Exhibit 1). The interview began at approximately 2:45 p.m. (TR. 29). Investigator Mueller told Young he was not in custody and she wanted to ask Young some questions concerning his friending of children (TR. 30). Young told Investigator Mueller he had "friended" approximately a thousand people on Facebook but had narrowed that list down for further communication (TR. 31). Young stated he used Facebook and Xbox LIVE to communicate with kids in the age range of twelve to fourteen as he was comfortable communicating with them (TR. 32). Young stated he had made contact with some of the kids at the Columbus skating rink (TR. 32). One of those Young befriended was a 14-year old girl (referred to as E14 during the hearing) whom Young talked about affectionately saying they shared stories and problems in their lives (TR. 32-33). Investigator Mueller left the interview room and asked Investigator Lozos to contact E14 and her mother and ask them to come to the Columbus police station for an interview (TR. 33).

Investigator Mueller returned to the interview room with her laptop computer and accessed the Internet (TR. 34). Investigator Mueller logged onto Facebook and, with Young's assistance, accessed Young's

Facebook account (TR. 34). Young's Facebook account was quite active and Investigator Mueller wanted to access numerous messages in Young's Facebook account (TR. 34-35). However, Young was very selective in what he would allow Investigator Mueller to see in the account (TR. 35). Investigator Mueller continued to talk with Young about his contacts with numerous young teenagers (TR. 36-37).

While Investigator Mueller was talking with Young in the interview room, Investigator Lozos contacted E14 and her mother who came to the Columbus police station (TR. 38). Investigator Mueller left the interview room containing Young to talk with E14 and her mother in another interview room (TR. 39). E14 informed Investigator Mueller she had met with Young, she had a relationship that was more than a friendship with Young, and had conversed with him about sexual matters (TR. 40-41). E14 said she had attempted to break off the relationship with Young but he wanted to continue the relationship (TR. 41).

Investigator Mueller returned to the interview room with Young and questioned him about the relationship with E14 (TR. 41). Young stated he had discussed sexual relations with E14 and had met E14 at a local park in Columbus (TR. 41). Investigator Mueller told Young she wanted to delve more deeply into the relationship with E14 including any physical touching, so Investigator Mueller advised Young of his *Miranda* rights (TR. 41). Young invoked his rights and the interview was terminated (TR. 41-42). Following the interview, Young was arrested by Investigator Mueller "on the sexual assault of the child electronic enticement charge because he began a relationship on Facebook and continued the relationship meeting her in person and speaking of sex." (TR. 42).

After Young was booked into the Platte County Jail, Investigator Mueller prepared an application and affidavit for a warrant to search Young's residence at 3317 25th Street, Number 44, in Columbus, Platte County, Nebraska (TR. 46; Exhibit 2). The application and affidavit was presented to a Platte County judge who signed the search warrant (TR. 46-47). The affidavit set forth Investigator Mueller's interview with E14 and the sexual contact Young had with her (Exhibit 2). The search warrant authorized a search for a seizure of:

> Written documents in communications with [E14] or describing the relationship with [E14], Computers and any other electronic devices used in the transmission of communication and solicitation of [E14], any electronic storage devices that may be used to store communications, including chat logs, inbox messages, posts, other communications. Nathan Young's cellular telephone and any smart cards or storage devices. XBox console device used

4

in communication with minor discussing relationship with [E14].

Exhibit 2.

The search warrant was executed around 9:30 a.m. the next day, September 22, 2011, by a team consisting of Investigators Mueller and Lozos, Officers Hefti, Pensick, and Magdelano, and Deputies Gragert and Jensen (TR. 48-49). Young's mother, Candace Young (Mrs. Young), was the only person present in the residence at the time (TR. 49). Numerous items were seized (Exhibits 4 and 102). During the search, Mrs. Young told the officers her son, Wilber Young, had been at the residence earlier in the morning and had removed some items (TR. 51). Investigator Lozos and Deputy Jensen left and drove to Wilber Young's residence and retrieved a cell phone and a laptop computer (TR. 51-52; Exhibit 4). On September 26, 2011, Investigator Mueller applied for and received a search warrant from the Platte County Court to perform a forensic examination upon various of the electronic devices seized on September 22, 2011 (TR. 53-55; Exhibit 3).

(Filing No. 39, at 3-8 (footnote omitted).)

## ANALYSIS

Young objects to the following portions of the Findings and Recommendation:

- the finding on page 4 that "[t]he interview room was not locked and Young could have left the room and the main police department without assistance if he chose";

- the conclusion on page 3 that he was not in custody and *Miranda* warnings were not required;

- the conclusion that the evidence seized was not the fruit of the poisonous tree;

- the finding that the following items listed on page 10 "clearly fall within the confines of the warrant authorizing the seizure of electronic devices involving transmission of communications and devices for storage of communications";

- the finding that the penile enhancement liquid and photos were seized as evidence in plain view; and

- the finding that the liquid male enhancement and photos were incriminating and immediately apparent to the searching officers.

5

I.     **Custody**

Young argues that although Investigator Mueller told him at the police station before questioning him that he was not in custody, she did not tell him that he was free to leave.  He points out that each time Investigator Mueller left the room, she closed the door.   He also argues that the questioning at the station was police dominated.

The factors that, at a minimum, should be considered in determining whether Young was in custody at the time of his questioning are the following:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong-armed tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated, *e.g.,* was questioning public or incommunicado, was suspect separated from those who would lend moral support, did authorities dictate the course of conduct of the suspect or other persons present, et cetera; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990).

Applying the *Griffin* factors, Young voluntarily went to the police station.  After agreeing to do so he went into his trailer to get a shirt and shoes and came out.  He asked if he could have a ride home and Investigator Mueller responded affirmatively. He only rode in the police car with the two officers to the station because the two vehicles at his residence were inoperable.   While at the outset of the questioning, Investigator Mueller did tell Young he was not in custody, she did not tell him he was free to leave.  No strong arm tactics or deceptive strategies were used, though the interview lasted from 3:00 p.m. until 5:41 p.m., with breaks when Investigator Mueller

left the room.  Young was given water to drink, and he never asked to leave.  Young was arrested when he was read his *Miranda* rights, invoked them, and declined to speak further with Investigator Mueller.

The only *Griffin* factor worthy of discussion is "whether the suspect possessed unrestrained freedom of movement during questioning."   The facts show that Investigator Mueller, Investigator Lozos, and Young entered the police station through a back door which required a security code.  They then walked through the booking room/holding cell area, and the door to or from that area was open as no one was in custody at the time.  They then walked farther into the building to the interview room area.  A member of the public would not be allowed to walk into the police station through the front door and back to the interview room area without an escort. Investigator Mueller led Young into the interview room, which measured approximately five by eight or nine feet.  She closed the shade covering the window and closed the door.  Each time she left the room she closed the door.

In deciding *United States v. Ollie,* 442 F.3d 1135 (8th Cir. 2006),[1] the Eighth Circuit considered that the defendant was told twice he was not in custody but was never told that he could end the interview or refuse to answer questions.  *Id*. at 1138. "While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine.   Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning."  *Id*.  The Eighth Circuit found that the lack of advice that a defendant is

---

[1]In *Ollie*, the Eighth Circuit concluded that he was in custody and therefore his statement to the police chief was suppressed.  The court found the deciding factor to be the order of Ollie's parole officer that Ollie meet with the police chief.  *Id*. at 1140.

7

free to end the session weighs in favor of a conclusion that the defendant is in custody.

*Id.* The court then stated the following with respect to the defendant's freedom to leave during the interview:

> A suspect will generally feel more able to end an interview when his mobility is unimpeded by the authorities. We thus look to see if Mr. Ollie was free to move about during the interview. When Mr. Ollie arrived at the police station, Chief McNeill took him to a small interview room. In that room, the Chief sat alone with Mr. Ollie and left the door ajar. In its order, the district court found no evidence that the police restrained Mr. Ollie's freedom of movement. Such a negative finding, however, is qualitatively different from stating that Mr. Ollie was free to move about. The record is silent on this issue because Mr. Ollie never tried to move about or leave the interview room. Because the record is thin, we believe that it is impossible to determine if Mr. Ollie retained his freedom of movement throughout the questioning.

*Id.*

As in *Ollie*, we do not know whether Young was free to move about or leave because the evidence does not indicate that he tried to do so. The DVD does not indicate that he tried to do so, and Young did not argue that he tried to do so. Young might not have been able to find his way or walk unescorted out of a secured area of the police station following a different path than the one officers followed in leading him into the station and to the interview room. However, the evidence does not conclusively show that he was not free to leave.

The Court turns to the question of police dominance as it relates to the custody issue. The focus lies with the "entire context of the questioning, including such considerations as place and length of the interrogation." *Griffin,* 922 F.2d at 1352. In *Ollie*, the Eighth Circuit stated: "It is true that an interview is not custodial simply because it occurs at the station house. But if the fact that questioning taking place on a suspect's 'home turf' cuts against a finding of custody, then the converse must also be

true: Interviews taking place on the police officers' 'home turf' are more likely to be police-dominated." *Id.* at 1139 (citations omitted). The Court finds that *Ollie* is similar to Young's situation in that Ollie's interview also took place at the police station in a small room where he sat alone with a police officer. However, Ollie was ordered by his parole officer to meet with the police chief, a very large man compared to Ollie's statute. Ollie's situation therefore differs from Young's in which Young voluntarily came to the police station and was with a female officer who was not considerably larger than Young or unduly intimidating. Taking all relevant factors into consideration, the Court concludes that in Young's case the situation was not "police dominated" within the meaning of *Griffin*.

In summary, the Court must consider the Eighth Circuit's approach when confronted with similar custodial situations: "where there is no clear indication that the defendant's freedom to depart has been restricted, we have typically concluded that a police station interview was noncustodial." *United States v. LeBrun*, 363 F.3d 715, 723 (8th Cir. 2004). As stated earlier, in Young's case there is no clear evidence that his freedom to leave was restricted. Therefore, after careful consideration the Court concludes that Young was not in custody. The Court therefore overrules Young's objections to the findings: on page 4 that "[t]he interview room was not locked and Young could have left the room and the main police department without assistance if he chose"; and the conclusion on page 3 that Young was not in custody and *Miranda* warnings were not required. Because Young statement was not illegally obtained, the Court also overrules the objection to the conclusion that the evidence seized during the search was not fruit of the poisonous tree.

9

## II.    Specific Items; Scope of Warrant

Young argues that the following items are not included within the items sought under the search warrant:

> Play Station 3 Console, "extenze liquid male enhancement", 8 x 12 printed photos, Compact Disc (1) Compact Discs (13), VHS Tapes (21), Framed Photo of Woman, Compact Discs (4), Polaroid One Time Use Camera, Memorex DVD-R (2), Documents, Cybershot Digital Camera, Compact Discs (23), CDR/ DVD-R Discs (99), Play Station II Console, JVC Mini Digital Cassettes (2), Sony HandyCam Camcorder, Cobra DVC 900 Video Camera and Compact Discs (31).

### A. Penile Enhancement Liquid; Printed Photographs; Framed Photograph

Officers seized the following items that do not fall within the categories of items listed in the search warrant: Extenze penile enhancement liquid; a framed photograph of a woman; and photographs of penises.  Judge Thalken concluded that the items were seized under the plain view doctrine.  Under the plain view doctrine, items may be seized without a warrant "'when (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself.'"  *United States v. McManaman,* 673 F.3d 841, 848 (8th Cir. 2012) (quoting *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (quoting *United States v. Weinbender*, 109 F.3d 1327, 1330 (8th Cir. 1997))).  Young objects to Judge Thalken's findings that the items in question were seized as evidence in plain view with incriminating character that was immediately apparent to the officers.

The Court finds that the officers did not violate the Fourth Amendment by being at Young's residence to execute the search warrant.  Moreover, the items were immediately apparent as incriminating because they appeared to be used for grooming

10

of victims, as explained during the hearing testimony.  However, the transcript of the hearing includes no testimony relating to where within the residence the items were found, which determines whether officers had a lawful right of access to the items. Therefore, the Court concludes that, based on the evidence presented, the items do not fall within the plain view doctrine.

Therefore, the Court sustains the objection to the finding that the penile enhancement liquid and photographs were seized as evidence in plain view.  With respect to these items, Judge Thalken's findings and recommendation is overruled and these items are suppressed.

## B. Remaining Items

Judge Thalken found that the remaining items fall within the categories of electronic devices used in the transmission of communications or storage of communications.  Young argues that a PlayStation III console, VHS tapes, a Polaroid one-time use camera, a cybershot digital camera, a Playstation II console, JVC mini digital cassettes, a Sony Handycam camcorder, and a Cobra DVC 900 video camera do not fall within the categories listed in the search warrant.

With respect to the argument that the Play Station devices, cameras, VHS tapes, CDs or DVDs were not specifically listed in the search warrant, "the requirement that a search warrant describe its objects with particularity is a standard of 'practical accuracy' rather than a hypertechnical one."  *United States v. Peters,* 92 F.3d 768, 769-70 (8th Cir. 1996) (finding that the term "records" in a search warrant included audio cassettes); *United States v. Lowe*, 50 F.3d 604, 607 (8th Cir. 1991) (finding the phrase "items that tend to show co-defendants or co-conspirators" included a video tape).  The PlayStation

11

devices are similar to the named Xbox device.   The remaining items including VHS tapes, cameras, and mini cassettes fall within the listed categories of smart cards or storage devices.   The Court finds that, under the practical standard followed by the Eighth Circuit, the items in question were included within the categories of "any smart cards or storage devices" or an "Xbox console device."   The Court overrules the objection to the finding that these items fall within the categories listed in the search warrant.

IT IS ORDERED:

1.   The Magistrate Judge's Findings and Recommendation (Filing No. 39) is adopted in part and overruled in part:

   a.   The Findings and Recommendation are overruled with respect to the items listed in ¶ 3(a) below;

   b.   Otherwise, the Findings and Recommendation are adopted;

2.   The Defendant's objection to the Findings and Recommendation with respect to the items listed in ¶ 3(a) below being seized in plain view is granted, and otherwise the objections (Filing No. 40) are overruled; and

3.   The Defendant's motion to suppress the evidence seized in the search (Filing No. 28) is granted in part and denied in part as follows:

   a.   The Defendant's motion is granted with respect to the Extenze penile enhancement liquid, a framed photograph of a woman, and photographs of penises; and

   b.   Otherwise, the Defendant's motion to suppress evidence seized in the search is denied;

4.      The Defendant's motion to suppress statement (Filing No. 26) is denied.

DATED this 3rd day of July, 2012.

                                        BY THE COURT:


                                        s/Laurie Smith Camp
                                        Chief United States District Judge